IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


DONNIE LEON THOMAS,
      Petitioner,

vs.                             Case No.:  3:11cv137/MCR/EMT

KENNETH S. TUCKER,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 30).  Petitioner filed a reply (doc. 39).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 30).[1]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2007-CF-328, with one count of burglary of a conveyance armed with explosives

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 30).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

or a dangerous weapon (Count 1), one count of attempted robbery armed with a firearm (Count 2), and one count of aggravated assault by threat with a firearm (Count 3) (Ex. A at 2–3).  Following a jury trial, he was found guilty as charged (Ex. A at 12–14, Exs. B, C).  On October 31, 2007, Petitioner was sentenced to thirty (30) years of imprisonment on Count 1 and concurrent terms of twenty (20) years of imprisonment on Counts 2 and 3, to run concurrently with the sentence on Count 1, with a 20-year mandatory minimum sentence on each count, pursuant to Florida Statutes § 775.087(2), and with pre-sentence jail credit of 113 days (Ex. A at 37–47, Ex. C at 247–49).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D07-6123 (Ex. E).  The First DCA affirmed the judgment per curiam without written opinion on June 22, 2009 (Ex. H).  Thomas v. State, 11 So. 3d 360 (Fla. 1st DCA 2009) (Table).  Petitioner did not seek further review.

On June 11, 2010, Petitioner filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. I at 1–18).  The state circuit court summarily denied the motion on October 25, 2010 (id. at 113–22).  Petitioner appealed the decision to the First DCA, Case No. 1D10-6345 (id. at 191).  The First DCA affirmed the judgment per curiam without written opinion on March 2, 2011, with the mandate issuing March 29, 2011 (Exs. J, K).  Thomas v. State, 56 So. 3d 772 (Fla. 1st DCA 2011) (Table).

Petitioner filed the instant federal habeas action on March 17, 2011 (doc. 1).  Respondent does not assert a statute of limitations defense (doc. 30 at 26).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19. In relevant part, section 2254(d) now provides:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect

to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring; <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), overruled on other grounds by Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or

unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87 (Jan. 19, 2011)). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. See Gill, supra at 1291 (citing Harrington, 131 S. Ct. at 786). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. See Harrington, 131 S. Ct. at 786; see also Gill, supra, at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal

court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. See Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. Id.

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. See Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.   PETITIONER'S CLAIMS

Ground One:  "The lower court erred [in failing] to conduct a hearing on Petitioner's competency."

Petitioner contends the trial court violated his due process rights by failing to order a competency evaluation or conduct a competency hearing (doc. 1 at 4, 6–7).[3] Petitioner asserts the trial court had reason to doubt his competency when he had an outburst during jury selection (id.). He asserts he raised this claim on direct appeal (id. at 4).

Respondent concedes Petitioner raised his federal due process claim on direct appeal, and the state court adjudicated the merits of the claim (doc. 30 at 31–31). Nevertheless, Respondent

---

[3] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

"expressly declines to waive any defenses or procedural bars" (*id.* at 30).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 31–35).

> 1.    Clearly Established Federal Law

The Due Process Clause of the Fourteenth Amendment prohibits states from trying or convicting a defendant who is mentally incompetent. *See* Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966).  The Supreme Court set the standard to be used in determining mental competency as whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed 2d 824 (1960) (per curiam); Drope v. Missouri, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *see also* Indiana v. Edwards, 554 U.S. 164, 128 S.Ct. 2379, 171 L. Ed. 2d 345 (2008).

In Drope, the Court elaborated as follows:

> [t]he import of our decision in Pate v. Robinson is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient.  There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.  That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

Drope, 420 U.S. at 180.

The Eleventh Circuit Court of Appeals has applied and expounded upon these standards. "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995) (citation omitted).  A Pate analysis must focus on "what the trial court did in light of what it then knew, whether objective facts known to the trial court were sufficient to raise a bona fide doubt as to the defendant's competency." Fallada v. Dugger, 819 F.2d 1564, 1568 (11th Cir. 1987).

A petitioner who makes a substantive competency claim, contending that he was tried and convicted while mentally incompetent, "is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." James v. Singletary, 957 F.2d 1562, 1571 (11th Cir. 1992).  This standard is in contrast to a petitioner who makes a procedural competency claim alleging that the trial court failed to hold a competency hearing after his competency was put at issue.  To prevail on a procedural competency claim, "a petitioner must establish that the state trial judge ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial."  Id. at 1572 n.15 (citing Fallada, 819 F.2d at 1568).  A petitioner who presents "clear and convincing evidence" which creates a "real, substantial and legitimate doubt" as to his competence is entitled to an evidentiary hearing on his substantive competency claim. Medina, 59 F.3d at 1106 (quoting James, 957 F.2d at 1573).  However, the standard of proof is high, and "the facts must positively, unequivocally, and clearly generate the legitimate doubt." Card v. Singletary, 981 F.2d 481, 484 (11th Cir. 1992) (quotations omitted).  Relevant information may include evidence of a defendant's irrational behavior, demeanor at trial, or prior medical opinion. See Watts v. Singletary, 87 F.3d 1282, 1287 (11th Cir. 1996).

A lifelong history of mental illness and emotional problems does not demonstrate incompetency without a specific showing of how these difficulties generated a substantial doubt as to the defendant's competency at the time in question.  See Medina, 59 F.3d at 1106; Card, supra. Similarly, the fact that the accused is undergoing treatment with psychiatric drugs, while relevant, does not alone prove incompetence.  See Sheley v. Singletary, 955 F.2d 1434, 1438–39 (11th Cir. 1992).  In order to establish incompetence, evidence must establish that the drugs affected the accused to the point that he could not effectively consult with his attorney and could not understand the proceedings.  See id. at 1439.

Furthermore, because legal competency is primarily a function of defendant's role in assisting counsel in conducting the defense, the defendant's attorney is in the best position to determine whether the defendant's competency is suspect, so "the failure of defense counsel to raise the competency issue at trial, while not dispositive, is evidence that the defendant's competency was not really in doubt and there was no need for a Pate hearing."  Watts, 87 F.3d at 1288; see also Adams v. Wainwright, 764 F.2d 1356, 1360 (11th Cir. 1985).

"A presumption of correctness attaches to a state court's finding of competence and a federal habeas court must determine that the finding is not 'fairly supported by the record' before it may overturn a state court's decision."  <u>Medina</u>, 59 F.3d at 1106 (quoting <u>Maggio v. Fulford</u>, 462 U.S. 111, 117, 103 S. Ct. 2261, 76 L. Ed. 2d 794 (1983)); *see also* <u>Card</u>, 981 F.2d at 484 n.5 (citing <u>Demosthenes v. Baal</u>, 495 U.S. 731, 110 S. Ct. 2223, 109 L. Ed. 2d 762 (1990)); <u>Lawrence v. McNeil</u>, 3:08cv69/SPM, 2010 WL 2890576, at *12 (N.D. Fla. July 21, 2010).

2.      Federal Review of State Court Decision

Petitioner raises a procedural competency claim, and he did so on direct appeal of his conviction (Ex. E).  In his initial brief, he argued the trial judge had sufficient information that raised a bona fide doubt regarding Petitioner's competency, and the court thus erred by failing to conduct a competency hearing (*id.*).  The First DCA affirmed the judgment per curiam without written opinion (Ex. H).

Although the state court's denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, under the "contrary to" prong of § 2254(d)(1), the state court need not cite federal law "so long as neither the reasoning nor the result of the state court decision contradicts the Supreme Court's precedents. *See* <u>Early</u>, 537 U.S. at 8. Additionally, Petitioner is not entitled to relief under the "unreasonable application" prong unless he demonstrates the decision is objectively unreasonable.  *See* <u>Wright v. Sec'y for the Dep't of Corr.</u>, 278 F.3d 1245, 1256 (11th Cir. 2002).

The record reflects that prior to the State's calling its last rebuttal witness, the prosecutor noted, outside the presence of the jury, that during jury selection, "Mr. Thomas [Petitioner] had an outburst, talking about the alpha, the omega, and stuff like that." (Ex. B at 135).  The prosecutor asked the trial judge to "make . . . some kind of statement that he [Petitioner] did, in fact, testify at trial, appeared to understand the questions, just for the record's sake, in case it is an issue on appeal" (*id.*).  The trial judge made the following statement:

> THE COURT:  . . . [T]he whole time that Mr. Thomas was over there talking to his counsel and the whole time he was in the room and then when he got up and he did that, that's all on video . . . .
> . . . .

First of all, this is not Mr. Thomas' first foray in front of this Court.  Because he was already before me on a case, a battery case, that he was arrested on in late—late '06, I think maybe October, November '06, something like that.  So he's been consistently before me since October of '06, something like that.  Then he had this charge that was in January of '07.  I revoked his bond and he was here each time, and at no time did Mr. Thomas ever appear to this Court to be incompetent, and I know that that doesn't always have to be.

But when Mr. Thomas was appearing to be incompetent the day of jury selection, he did it in a very erratic and vocal way, and that doesn't just pop up.  So it was very clear to this Court what was going on.  And then when Mr. Thomas came in and I read him the rule and read him the case law, Mr. Thomas then returned to the demeanor that I know.

And so it was this Court's determination that based upon all the factual observations of his many prior appearances in front of the Court, that morning having had what appeared to this Court to be meaningful discussions with his counsel both before and then after he decided to return back to the Mr. Thomas that I had observed previously, coupled with the fact that Ms. Amond [defense counsel] testified that she did not see that there was any need to have his competency testified [sic]—I mean, that she did not feel that there was a need to have him examined for competency—and I'm not sure I had this put on the record, but I do want you then to confirm all of this, Ms. Amond.  When you were asking for an evaluation the first time, it wasn't for competency.  It was for mitigation, correct?

MS. AMOND:  That's correct.

THE COURT:  All right.  So coupled with all of that, we came back and we did have jury selection, and Mr. Thomas—I put on the record that he was participating at the bench, as I do with all defendants.  And not only that, I noted that he was participating actually with the graph, following along and having, again, what appeared to be to the Court meaningful conversations with Ms. Amond during the jury selection process, discussing who should and shouldn't be a potential person for their—their jury.

Again, Mr. Thomas has participated today.  I have taken two colloquies as it related to different decisions that he has made regarding strategy in this trial.  And he has taken the stand, and he indeed responded to the questions that Mr. Simon [the prosecutor] and that Ms. Amond posed to him.  It was clear to this Court that he understood the questions.  He answered them in his own fashion, but indeed, he seemed to understand them, to comprehend them, and didn't have any problem answering them.

>So no, this Court, for factual observations, has no concern in any way that Mr. Thomas has any sort of a mental difficulty.  And, Mr. Thomas, would—and you are still under oath.  You understand what we're doing here today, sir?

>THE DEFENDANT:  Yes, ma'am.

(Ex. B at 137–38).  After the jury retired for deliberations, the trial judge made additional findings on the record:

>THE COURT:  . . . when I was making a record about the event that took place on jury day with—I mean, jury selection day with Mr. Thomas, I was going down a path and then forgot to get there, when I talked about that Mr. Thomas had been before me since October.  In that case, that attorney never expressed any concern about Mr. Thomas' mental health.

>Further, we actually took a plea in that case in June of—the end of June.  I think it was June.  I think it was June 21st of 2007.  And at that time, again, the attorney expressed no concern.  This Court had no concern or it certainly would not have accepted the plea.  And that was just very shortly before this jury selection [on October 29, 2007].

(Ex. C at 226).

Petitioner's outburst during jury selection is not included in the transcript of the jury selection proceeding (*see* Ex. D at 81–144).  However, that transcript does reflect rational, meaningful interactions between Petitioner and the court and defense counsel.  During the exercise of strikes during jury selection, the court and Petitioner had the following exchange, which indicated Petitioner was actively participating in jury selection:

>THE COURT:  And, Mr. Thomas, can you hear me okay?  Because I'm trying to whisper, but I know you've got a sheet and you're following along.

>THE DEFENDANT:  Yes, ma'am.

(Ex. D at 132).  The transcript of jury selection also indicates that defense counsel consulted with Petitioner as to whether to strike juror number nine (*id.* at 136).  The court thereafter inquired:

>THE COURT:  All right.  Mr. Thomas, there are the people that you folks have selected to be the jury.  Are you satisfied with this group of people?

>THE DEFENDANT:  Yes, ma'am
>. . . .

> THE COURT:  Let's try this again.  Mr. Thomas, Mr. Simon changed his mind on some things, so we're back at this again.  Are you satisfied with this group of people?
>
> THE DEFENDANT:  Yes, ma'am.

(Ex. D at 139, 141).

Prior to commencement of trial, the prosecutor indicated he and defense counsel agreed that the defense would not contest the basis of the fingerprint expert's comparison of fingerprints found at the crime scene with Petitioner's (namely, that the expert compared the fingerprints at the scene with fingerprints taken of Petitioner when he was previously booked into the jail) (Ex. B at 7).  The trial judge conducted a colloquy with Petitioner during which she inquired whether Petitioner had discussed the decision with defense counsel and agreed with counsel's decision (*id.* at 8).  Petitioner answered affirmatively.  The court further inquired whether Petitioner was confused about the issue or had further questions for defense counsel, and Petitioner responded, "No, ma'am, I don't." (*id.*).

Additionally, after the State rested its case, and defense counsel advised the court that Petitioner desired to testify, the court conducted the following colloquy:

> THE COURT:  So I just need to ask you some questions.  You understand, sir, that if you want to get up and take the stand, that is absolutely your right.
>
> THE DEFENDANT:  Yes, ma'am.
>
> THE COURT:  And you can absolutely do that.
>
> THE DEFENDANT:  Yes, ma'am.
>
> THE COURT:  You also understand that you have a constitutional right to remain silent, if you choose to.
>
> THE DEFENDANT:  Yes, ma'am.
>
> THE COURT:  And the reason you have the right to remain silent is because the State has the burden of proving their case.  You don't have to prove anything.  Do you understand that?
>
> THE DEFENDANT:  Yes, ma'am.

THE COURT:  And, indeed, you heard me this morning read the statement that if you did decide to remain silent, that the jury was not to take anything from that.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And I will also assure you that if you choose to exercise that right, I will do that at the end.  Do you understand that?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Again, have you had a conversation with Ms. Amond about whether or not you should testify?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And, again, I don't want to know the substance of that conversation, but are you confused in any way about that conversation?

THE DEFENDANT:  No, ma'am.

THE COURT:  Do you need any further time with her to make the decision?

THE DEFENDANT:  No, ma'am.

THE COURT:  And do you believe it would be within your best interest to take the stand and testify?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  Then I find that he is freely, voluntarily, and intelligently exercising his right to testify.

(Ex. B at 101–03).

Review of the transcript of Petitioner's trial testimony does not indicate any issue as to Petitioner's competency (*see* Ex. B at 104–23).  His testimony was responsive to questions posed by defense counsel and the prosecutor and reflected a rational and factual understanding of the case.

The trial judge's observation of Petitioner's conduct, both prior to and during trial, the weight attributed to the last-minute timing of Petitioner's single, irrational verbal outburst during jury selection, and Petitioner's immediate return to normal demeanor after the judge advised him

of the law regarding competency, support the trial judge's determination that there was insufficient question as to Petitioner's competence to warrant invocation of Florida procedures for evaluating his competency. Additionally, although the trial judge's comments suggest that during pretrial proceedings, defense counsel requested a psychological evaluation for purposes of mitigation at sentencing, defense counsel clearly confirmed during trial that she saw no need for a competency evaluation. Further, defense counsel's failure to pursue a competency evaluation, despite ample time and opportunity to do so, suggests an absence of any indication Petitioner was unable to assist in his defense. Finally, there is no record evidence of any irrational behavior or other troubling demeanor before or after the verbal outburst during jury selection, and there is no evidence of any such problem throughout the course of the trial. To the contrary, throughout trial, Petitioner behaved and spoke in a rational manner that indicated he had a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and that he had a rational and factual understanding of the proceedings.

Petitioner has failed to demonstrate that the state court's rejection of this claim relied upon an unreasonable determination of the facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, the undersigned cannot conclude that the state court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on Ground One.

B.    Ground Two (Petitioner's Ground Two (1)):  "The state court erred in denying Petitioner's claim of ineffective assistance of counsel for failing to file motion to suppress the victim's pretrial identification and failing to object to the in-court identification's taint."

Petitioner contends defense counsel was ineffective for failing to seek suppression of the victim's pretrial identification of him as the perpetrator, and failing to object to the victim's in-court identification (doc. 1 at 9–10). He asserts the pretrial identification was impermissibly suggestive for three reasons. First, the victim could have seen Petitioner's photograph during a local news broadcast which announced his arrest. Petitioner asserts the victim admitted he watched the broadcast, but stated he could not remember if he saw Petitioner's picture. Second, the victim was shown a video of the crime before he identified Petitioner. Third, the victim could not identify

Petitioner when he first viewed a photographic lineup, but then identified Petitioner when his photograph was again included in a second lineup.  Petitioner contends defense counsel should have objected to the in-court identification as unreliable, because it was tainted by the impermissibly suggestive pretrial identification, and the victim used the photographic array, which included his initials near Petitioner's picture, when identifying him in court.

Respondent "expressly declines to waive any defenses or procedural bars" (doc. 30 at 36) but admits that Petitioner presented all of these arguments in his state postconviction motion, and the state courts adjudicated the merits of the claim (*id.* at 36–42).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).

1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on

ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. See Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial,

not on appeal.  *See* <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).

    2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground I in his Rule 3.850 motion (Ex. I at 3–4, 10–13).  The state circuit court identified the <u>Strickland</u> standard as the applicable legal standard (*id.* at 113–14).  The court adjudicated the claim as follows:

> In the Defendant's first claim for post-conviction relief, the Defendant asserts that his counsel was ineffective for failing to file a motion to suppress the victim's pre-trial identification and his in-court identification of the Defendant.   The Defendant claims that the photographic lineup was "tainted" by the victim seeing the Defendant's photograph on the news prior to making the identification and seeing a video of the crime.  The record conclusively demonstrates that the Defendant is not entitled to relief on this claim.

> Troy Brown of the Escambia County Sheriff's Office gave testimony at trial regarding the photographic lineups used in this case.  Deputy Brown testified that on January 19, 2007, the victim was presented with a photographic lineup at his home.  <u>Attachment 1</u>, at 70–71.  At that time, the victim was unable to identify anyone in the photographic lineup.  <u>Id.</u>, at 71.

> Later, the victim was presented with a second photographic lineup.  <u>Id.</u>, at 72.  In this second lineup, a different picture of the Defendant was used.  In this second lineup, the Defendant's picture was a more recent photograph than the one used in the initial photographic lineup.  <u>Id.</u>  This time, the victim "immediately pointed [the Defendant] out."  <u>Id.</u>, at 73.

> The victim testified that, although he watched the news prior to performing the photographic lineup, the victim "didn't see any photographs prior to doing the photographic lineup."  <u>Attachment 1</u>, at 49.  The victim clearly testified that when he watched the news prior to seeing the photographic lineup, the news did not "*show any—any photographs of anybody because there was none to give.*"  <u>Id.</u>, at 41 (emphasis added).

Even if the witness had viewed the video of the crime prior to viewing the photographic lineup, that would not render the photo lineup impermissibly suggestive or "tainted." The record reflects that the video did not clearly show the gunman's face.[FN 1: During closing, the Defendant's counsel argued, "You can look at that video all you want, and you can't tell who that person is." <u>Attachment 1</u>, at 174–175.] <u>Attachment 1</u>, at 18.

It should be noted that, at trial, the victim expressed no uncertainty as to whether the Defendant was the gunman. Indeed, the victim testified: "You know what? It's so—it's like it was yesterday, as far as the facial [sic] of the gentleman who's sitting before us." The victim continued, "So I know that's who—who the gun belonged to and who did this to me." <u>Id.</u>, at 49.

The only difference that is supported by the record between the first photographic lineup and the second was that the police were able to show the victim an updated picture of the Defendant during the second lineup. Showing an updated photo is not "impermissibly suggestive," especially considering that the second photo lineup contained photographs both of persons who were in the first photo lineup and persons who were not in the first photo lineup. <u>Attachment 1</u>, at 75–76.

Accordingly, the record refutes the Defendant's claim that his counsel was ineffective for failing to challenge the second photo lineup as being "tainted" by news coverage or by the victim viewing the security video.

Moreover, even if the victim's identification of the Defendant had not been introduced into evidence, it should be noted that another eyewitness positively identified the Defendant as the gunman. <u>Attachment 1</u>, at 139–143. Indeed, as previously noted, the Defendant conceded that his fingerprints were recovered from the car door used by the gunman. <u>Attachment 1</u>, at 115–117.

(Ex. I at 115–17).

Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. J).

The improper use of photographs by police may reduce the trustworthiness of a subsequent lineup or courtroom identification. <u>Simmons v. United States</u>, 390 U.S. 377, 383–84, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968). "The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." 390 U.S. at 384. "[E]ach case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following

a pretrial identification by photograph will be set aside on that ground only if the photograph identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* "Where suggestive pretrial confrontations may have created a substantial likelihood of irreparable misidentification at trial, the core question is whether under the totality of the circumstances, the in-court identification was reliable." Jones v. Newsome, 846 F.2d 62, 64 (11th Cir. 1988). The following factors should be considered in making that determination: (1) whether the witness had the opportunity to view the criminal at the time of the crime; (2) the degree of attention by the witness; (3) the accuracy of the witness's prior description; (4) the level of certainty displayed by the witness; and (5) the length of time between the crime and the identification. Neil v. Biggers, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972). "While the ultimate conclusion as to the reliability of identification evidence is a mixed question of law and fact not governed by the Section 2254(d) presumption, each of the Neil v. Biggers factors is considered an issue of fact governed by the presumption." Jones, 846 F.2d at 64.

In the instant case, the state court found as fact that the "pretrial confrontation" at issue, that is, the photographic lineup, was not impermissibly suggestive. Petitioner has not produced clear and convincing evidence to rebut this finding. Petitioner submitted a copy of both lineups with his reply brief, and there is nothing about the array itself that is impermissibly suggestive (doc. 39, Ex. 3). Further, Investigator Brown's trial testimony regarding the procedure he employed in preparing each lineup and presenting it to the victim, supports the state court's finding that the second lineup, from which Petitioner was identified, was not impermissibly suggestive (Ex. B at 70–76). The record also supports the state court's findings that the second lineup included photographs of some persons—in addition to Petitioner—who were also in the first lineup, and that the second lineup was not tainted by news coverage or the victim's viewing the videotape from a camera placed in the area by the local sheriff's office. Investigator Brown testified that another person's photograph, besides Petitioner's, appeared in both lineups (*id.* at 75–76). Additionally, as the state court found, the victim testified that when he watched the news prior to seeing the photographic lineup, the news did not "show any—any photographs of anybody because there was none to give." (*id.* at 41). Further, the victim testified at trial that he viewed the video <u>after</u> he viewed the second photographic lineup, albeit he testified he was "not positive" he did so (*id.* at 47); and he testified in his pretrial deposition

that he viewed the video after the second lineup (*see* doc. 39, Ex. 3).  In the absence of any showing that the victim's pretrial identification of Petitioner was tainted by unduly suggestive procedures, defense counsel had no legal basis for seeking suppression of either the photo lineup or the victim's in-court identification.  *See* <u>Cikora v. Dugger</u>, 840 F.2d 893, 897 (11th Cir. 1988) ("Because we conclude that the district court was not clearly erroneous in finding that the photo array was not impermissibly suggestive, we need not reach the five-factor <u>Neil v. Biggers</u> test.").

Additionally, Petitioner failed to show a reasonable probability of a different outcome at trial had counsel sought suppression of either or both identifications.  Another eyewitness to the crimes, Ann Marie Franklin, testified she was familiar with Petitioner and identified him as one of the two men who attempted to rob the victim and as the man who had actual possession of the gun when the crimes were committed (Ex. B at 139–43).  Additionally, a fingerprint expert testified that Petitioner's fingerprint was on the handle of the victim's car door (*id.* at 94–97 ).  During Petitioner's trial testimony, he admitted his fingerprints could have been on the door handle (Petitioner testified he had been in the victim's vehicle earlier that morning during a drug transaction) (*id.* at 110–11, 117, 122).  He also admitted that one of the robbers in the video was approximately his size (*id.* at 117).  Moreover, defense counsel placed the identification issue before the jury by rigorously cross-examining the victim about the reliability of his identification, eliciting testimony from the convenience store owner that he knew Petitioner and could not identify the person in the video as Petitioner, and arguing during closing argument that the robber's identity was not discernible in the video (Ex. B at 46–48, 78, Ex. C at 174–75).  Therefore, Petitioner failed to show prejudice or, as previously discussed, deficient performance with regard to counsel's failure to seek suppression of the victim's pretrial or in-court identification.

Petitioner failed to demonstrate that the state court's adjudication of the claim was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is not entitled to relief on this ineffective assistance of counsel claim.

C.      <u>Ground Three (Petitioner's Ground Two (2)):  "The state court erred in denying Petitioner's claim of ineffective assistance of counsel were [sic] counsel failed to order a competency hearing and failed to notify the court that Petitioner was under the influence of psychotropic medications throughout all trial proceedings."</u>

Petitioner argues defense counsel should have requested a competency evaluation after his abnormal behavior during jury selection, especially since counsel knew that he was taking psychotropic medication for his mental illness (doc. 1 at 11–12). Petitioner further contends counsel should have notified the trial court that Petitioner was taking psychotropic medication, because that fact was relevant to the court's determination as to whether a competency evaluation was required (*id.*).

Respondent again "expressly declines to waive any defenses or procedural bars" (doc. 30 at 43) but admits that Petitioner presented this claim in his state postconviction motion, and the state courts adjudicated the merits of the claim (*id.* at 43–46). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).

          1.          Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

          2.          Federal Review of State Court Decision

Petitioner raised this claim as Ground II in his Rule 3.850 motion (Ex. I at 4–5, 13–14). The state circuit court adjudicated the claim as follows:

> Defendant asserts that counsel was ineffective for failing to move for a competency hearing regarding the Defendant's competency to stand trial and for failing to inform the Court that the Defendant was on "psychotropic drugs." The record conclusively demonstrates that the Defendant is not entitled to relief on this claim. <u>Attachment 1</u>, 135–138. The issue of the Defendant's competency was discussed on the record in the midst of trial. The Court found as follows:

> > The Court:    So he's been consistently before me since October of '06, something like that. Then he had this charge that was in January of '07. I revoked his bond and he was here each time, and at no time did Mr. Thomas ever appear to this Court to be incompetent, and I know that that doesn't always have to be.

> > But when Mr. Thomas was appearing to be incompetent the day of jury selection, he did it in a very erratic and vocal way, and that doesn't just pop up. So it was very clear to this Court what was going on. And then when Mr. Thomas came

in and I read him the rule and read him the case law, Mr.
Thomas then returned to the demeanor that I know.

Attachment 1, at 136–137.

Subsequently, the Court continued:

The Court:     Again, Mr. Thomas has participated today.  I have taken two
               colloquies as it related to different decisions that he has made
               regarding strategy in this trial.  And he has taken the stand,
               and he indeed responded to the questions that Mr. Simon [the
               prosecutor] and that Ms. Amond posed to him.  It was clear
               to this Court that he understood the questions.  He answered
               them in his own fashion, but indeed, he seemed to understand
               them, to comprehend them, and didn't have any problem
               answering them.

               So no, this Court, for factual observations, has no concern in
               any way that Mr. Thomas has any sort of a mental difficulty.
               *And, Mr. Thomas, would—and you are still under oath.  You
               understand what we're doing here today, sir?*

The Defendant:  *Yes, ma'am*.

Attachment 1, at 138 (emphasis added).

Finally, the  Court  would  note  that  the  record  reflects  the  following  exchange
between the Court and the Defendant's counsel:

The Court:     . . . Ms. Amond testified that she did not see that there was
               any need to have his competency testified [sic]—I mean, that
               she did not feel that there was a need to have him examined
               for competency—and I'm not sure I had this put on the
               record, but I do want you then to confirm all of this, Ms.
               Amond.  When you were asking for an evaluation the first
               time, it wasn't for competency.  It was for mitigation, correct?

     Ms. Amond:  That's correct.

Attachment 1, at 137.

     Thus, the record demonstrates that the Defendant's attorney had no concerns
as to the Defendant's competency.  The Defendant stated under oath to the Court that

he understood the proceedings.  More importantly, the Court made it plain for the
record that it found the Defendant's erratic conduct during jury selection not to be
genuine.   Furthermore, the Court made the factual finding that during the
proceedings the Defendant was able to understand questions posed to him and
appropriately answer those questions.  The Court stated that after it had multiple
opportunities to observe the Defendant, it had "*no concern in any way that Mr.
Thomas has any sort of a mental difficulty*." Attachment 1, at 138 (emphasis added).
Thus, the Defendant's counsel cannot be considered ineffective for failing to raise
an issue of the Defendant's competency when the Court was fully satisfied, based on
factual determinations, that the Defendant was competent to stand trial.

(Ex. I at –118–19).

        Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower

court's decision without written opinion (Ex. J).

        Petitioner failed to show that defense counsel's failure to notify the trial court of Petitioner's

medication and failure to request a competency evaluation was unreasonable.  Petitioner submitted

his medical records as an exhibit to his Rule 3.850 motion (Ex. I at 64–99).  The records cover the

period from March through November, 2007 (*id.*).  The records indicate that in March of 2007,

Petitioner was seen by a mental health professional in the jail for reportedly hearing voices "telling

what he can and can't do" (*id.* at 83).  The mental health professional noted that Petitioner's chart,

which dated back to 2002, included no history of mental health treatment while incarcerated at the

jail, and made no mention of mental health treatment outside the jail (*id.*).  Petitioner was diagnosed

with schizophrenia-paranoid type based upon his report of a family history of the disease in his

mother and grandfather (*id.* at 71, 80–82, 83).  He was prescribed Risperdal (an anti-psychotic drug)

from March 23, 2007 to May 21, 2007, but was changed to Geodon (another anti-psychotic drug)

due to his complaint of headaches (*id.* at 73, 74, 82, 88–99).

        On October 17, 2007, two weeks prior to trial, Petitioner was changed from Geodon to

Prolixin (a medication used to treat symptoms of schizophrenia) due to "shakes" (*id.* at 68, 85–86,

89).  The records indicate on that date he was oriented to time, person, place, and situation (*id.*).  His

behavior was unremarkable, and his attitude was cooperative (*id.*).  His speech was coherent, and

his memory intact (*id.*).  His mood was depressed, and his affect somewhat blunted (*id.*).  His

thought processes were logical, but his thought content had indications of paranoia (*id.*).  Petitioner

denied delusions or any psychotic symptoms, but he reported insomnia and that he isolated himself (*id.*).  He was additionally prescribed Sinequan, an anti-depressant, at that time (*id.*).

The mental health record dated October 24, 2007, just five days prior to jury selection and seven days prior to trial, indicate Petitioner's attitude was appropriate, he appeared neat, his behavior was calm and cooperative, his speech was normal, his mood was euthymic (moderate, not manic or depressed), his thought process/content was coherent, his insight and judgment were good, and he was "oriented in all spheres" (*id.* at 67).  Petitioner reported he was "doing better" and did not report any auditory hallucinations (*id.*).

On October 30, 2007, the day after jury selection and the day before trial, Petitioner's attitude was appropriate, he appeared disheveled, but his behavior was calm and cooperative, his speech was normal, his mood was euthymic, his affect was good, his thought process/content was coherent, his insight and judgment were good, and he was "oriented in all spheres" (*id.* at 66). Petitioner did not report any auditory hallucinations (*id.*).

Petitioner's medical records do no suggest any reason for defense counsel to question Petitioner's competency.  The mere fact that he was taking psychiatric drugs did not alone prove he was incompetent.  Additionally, as discussed *supra* in Ground One, Petitioner's single, irrational verbal outburst during jury selection was insufficient to raise a bona fide issue as to Petitioner's competency, when considered in the context of his immediate return to normal demeanor, his participation in jury selection and other decisions concerning his defense, and his rational, coherent, and appropriate responses to questions by his counsel and the prosecutor during his own testimony. Further, there is no record evidence of any irrational behavior or other troubling demeanor before or after the verbal outburst during jury selection, and there is no evidence of any such problem throughout the course of the trial.  Therefore, counsel's failure to notify the court of Petitioner's medication or request a competency evaluation was not unreasonable.  Furthermore, Petitioner has failed to establish a reasonable probability that the trial court would have properly determined there was a bona fide issue as to Petitioner's competency had the court known of Petitioner's mental condition and medications.

Petitioner failed to demonstrate that the state court's adjudication of the claim was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of Strickland.  Therefore, he is not entitled to relief on this claim.

D.     Ground Four (Petitioner's Ground Two (3)):   "The state court erred in denying Petitioner's claim of ineffective assistance of counsel were [sic] counsel failed to do a thorough pre-trial investigation into the relevant laws and facts applicable to Petitioner's case."

Petitioner contends defense counsel failed to thoroughly investigate the law and facts of his case and, as a result, presented a "virtually impossible defense" and overlooked a "reasonable line of defense" (doc. 1 at 13–14).  He contends the state court failed to discuss or rule upon this issue in its order denying his Rule 3.850 motion, and the court failed to conduct an evidentiary hearing or attach portions of the record conclusively refuting his allegations (*id.*).  Therefore, the state court's adjudication was contrary to federal and state law (*id.*).

Respondent contends Petitioner failed to fairly present a claim to the state court, because he failed to specify in his Rule 3.850 motion (1) how counsel's pretrial investigation was deficient, (2) the line of defense counsel should have investigated, or (3) how he was prejudiced by counsel's alleged error (doc. 30 at 46–47).  Respondent thus contends the claim was not properly exhausted and is procedurally defaulted (*id.* at 47).  Respondent additionally contends Petitioner failed to sufficiently plead his claim in his federal petition; therefore, it should be denied (*id.* at 47–49).  Third, Respondent argues Petitioner failed to present a federal claim in his federal petition, because he alleges only that the state court failed to follow state rules in addressing his claim (*id.* at 49).  Finally, without waiving these defenses, Respondent contends to the extent Petitioner raises the claim he presented as Ground III of his Rule 3.850 motion, he failed to show the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law (*id.* at 50–52).

In Petitioner's reply, he argues the state postconviction court addressed only his contention that counsel should have advised him of the principal theory of liability and pursued an "independent act" defense (doc. 39 at 21–23).  Petitioner contends the state court failed to address his argument that counsel should have investigated the reliability of the victim's pretrial identification, and Petitioner's competency to stand trial (*id.*).

1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

In Ground III of Petitioner's Rule 3.850 motion, Petitioner argued only that defense counsel was ineffective for failing to explain the principal theory of liability to him (Ex. I at 5–8).  Petitioner argued had counsel done so, he would have directed counsel to present an "independent act" defense (*id.*).

The state circuit court adjudicated the claim as follows:

> The Defendant claims that his counsel was ineffective for "overlooking" the "independent act" theory of defense.  The record conclusively demonstrates that the Defendant is not entitled to relief.
>
> As the Fifth District Court of Appeal has explained:
>
>> The Independent Act defense applies to a situation in which, after participating in a common plan or design to commit a crime, one of the co-defendants embarks on acts not contemplated by the other defendants or participants in the crime, and commits additional criminal acts beyond the scope of the original collaboration.  <u>Ward v. State</u>, 568 So. 2d 452, 453 (Fla. 3d DCA 1990).  The purpose of the defense is to exonerate a defendant from acts committed by another defendant, which departed from the original plan.
>
> <u>Barfield v. State</u>, 762 So. 2d 564, 566 (Fla. 5th DCA 2000).
>
> The Defendant was not prosecuted or convicted under a principal theory.  Rather, the Defendant was tried as the one who demanded money from the victim, the one who actually possessed a firearm, and the one who shot at the victim as he escaped.  <u>Attachment 1</u>, at 15–17; 26–36, 42.  Thus, the independent act defense would be of no benefit to undermining the State's case.
>
> Furthermore, the Defendant himself testified that he was not near the victim's car during the attempted robbery at all.  <u>Attachment 1</u>, at 109.  In other words, the Defendant testified under oath that he had nothing to do with events surrounding the attempted robbery.  <u>Attachment 1</u>, at 122.  Therefore, counsel cannot be considered ineffective for not pursuing an "independent act" theory of defense; such a defense would be unavailing against the State's contention that the Defendant was the one who demanded money from the victim, was the one who possessed a revolver, and was the one who fired a bullet which struck the victim's cell phone.  Moreover, the

independent act theory of defense would have been directly contrary to the Defendant's own sworn testimony that he had nothing to do with the robbery.

(Ex. I at –119–20).

Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. J).

To the extent Petitioner raises the same claim here, he exhausted the claim, and the state court adjudicated the merits.  The record supports the state court's finding that the theory pursued by the prosecution was not that Petitioner was a principal to the crimes; rather, Petitioner actually entered the backseat of the victim's vehicle with a handgun and with the intent to rob him, he actually demanded money from the victim while in the vehicle and while he actually possessed the handgun, and he threatened to do violence to the victim with the handgun and actually fired the gun at the victim.  The prosecutor did not argue a principal theory of liability in his opening statement or closing argument, nor did the prosecutor request a jury instruction on the principal theory of liability (*see* Ex. A at 15–32, Ex. B at 15–17, Ex. C at 155–74, 181–85).  Because the State's case against Petitioner was not based upon a principal theory of liability, defense counsel's failure to advise Petitioner of this theory was not unreasonable.

Additionally, the theory of defense pursued by counsel, that Petitioner did not have any involvement in the crimes, was a much stronger theory than an "independent act" theory.  Had counsel pursued an independent act defense, Petitioner would have had to admit he was one of the men shown in the video committing the crimes, and when combined with the fingerprint expert's testimony that Petitioner's fingerprints were found on the areas of the victim's car touched by the man who entered the rear passenger seat, as well as the victim's testimony that the man in the back seat was the one with the gun, a conviction on all counts would have been certain.  Therefore, the state court's adjudication of this aspect of Petitioner's claim was reasonable under Strickland.

To the extent Petitioner argues counsel was ineffective for failing to investigate the reliability of the victim's pretrial identification and Petitioner's competency, he failed to show he was prejudiced by counsel's alleged errors.  As discussed *supra*, Petitioner failed to show that the pretrial identification was impermissibly suggestive or that there were sufficient facts raising a bona fide doubt regarding his competency to stand trial.  Therefore, Petitioner failed to show a reasonable

probability of a different outcome had counsel investigated the victim's pretrial identification or Petitioner's competency.  Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

      E.      Ground Five (Petitioner's Ground Three):  "Conviction violated double jeopardy."

      Petitioner contends his conviction for armed assault by threat violated double jeopardy, because it "arose out of the commission of" the armed burglary (doc. 1 at 15–17).  Petitioner admits in his petition that each of the offenses of which he was convicted are separate offenses under Blockburger v. United States, 284 U.S. 299 (1932), because each offense contains an element not contained in the others (id. at 17).  However, in his reply brief he argues armed assault by threat was a lesser included offense of armed burglary (doc. 30 at 24).

      Respondent concedes Petitioner raised this claim in his Rule 3.850 motion (doc. 30 at 52).  Respondent asserts the state court properly found that the matter was procedurally barred, because it should have been raised on direct appeal (id.).  Respondent thus contends Petitioner failed to properly exhaust the  claim, and it is procedurally barred from federal review (id. at 52–54).

      Respondent's exhaustion argument is not supported by the record.  The state court did not determine that Petitioner's double jeopardy argument was procedurally barred; instead, the court adjudicated the double jeopardy claim on the merits (Ex. I at 120–21).[4]  Petitioner appealed the decision to the First DCA, and the appellate court affirmed (Ex. J).  Therefore, the claim was exhausted.

      1.      Clearly Established Federal Law

      The Double Jeopardy Clause embodies three separate guarantees:  "It protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense."  Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 307–08 (1984) (citation and footnote omitted).  "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."

---

[4] The state court determined that Petitioner's challenge to the jury instructions was procedurally barred (Ex. I at 121).

<u>Missouri v. Hunter</u>, 459 U.S. 359, 366, 103 S. Ct. 673, 678, 74 L. Ed. 2d 535 (1983); <u>Whalen v. United States</u>, 445 U.S. 684, 689, 100 S. Ct. 1432, 1436, 63 L. Ed. 2d 715 (1980) ("The Double Jeopardy Clause at the very least precludes . . . courts from imposing consecutive sentences unless authorized by [the legislature] to do so."); <u>Albernaz v. United States</u>, 450 U.S. 333, 344, 101 S. Ct. 1137, 1145, 67 L. Ed. 2d 275 (1980) (stating, "the question of what punishments are constitutionally permissible is not different from the question of what punishment the Legislative Branch intended to be imposed.  Where [the legislature] intended . . . to impose multiple punishments, imposition of such sentence does not violate the Constitution."); <u>Brown v. Ohio</u>, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225, 53 L. Ed. 2d 187 (1977) (noting "[w]here consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.").

"Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature . . . intended that each violation be a separate offense." <u>Garrett v. United States</u>, 471 U.S. 773, 778, 105 S. Ct. 2407, 2411, 85 L. Ed. 2d 764 (1985)).  Although the Double Jeopardy Clause does not flatly prohibit the legislature from punishing the same conduct under two different statutes, federal courts assume that the legislature ordinarily does not intend to do so "'in the absence of a clear indication of contrary legislative intent.'"  <u>Hunter</u>, 459 U.S. at 366 (quoting <u>Whalen</u>, 445 U.S. at 691–92); *see also* <u>Garrett</u>, 471 U.S. at 779 (holding that multiple punishments are permissible "when the legislative intent is clear from the face of the statute or the legislative history"); <u>Ohio v. Johnson</u>, 467 U.S. 493, 499 n.8, 104 S. Ct. 2536, 2541 n.8, 81 L. Ed. 2d 425 (1984) ("[I]f it is <u>evident</u> that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." (emphasis added)).  If no clear intention is evident, the provisions are analyzed under the "same elements" test announced in <u>Blockburger v. United States</u>, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), which "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." <u>United States v. Dixon</u>, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856, 125 L. Ed. 2d 556 (1993).  Although the court will decide under federal law whether a double jeopardy violation has occurred, it must accept the Florida courts' interpretation of the state's own statutes.  <u>Hunter</u>, 459 U.S. at 368.

The Eleventh Circuit summarized its interpretation of Supreme Court law regarding double jeopardy as follows:

> To summarize, our review of a potential double jeopardy violation arising from a single prosecution is a two-stage analysis.  First, we ascertain whether there exists a clear legislative intent to impose cumulative punishments, under separate statutory provisions, for the same conduct.  If a clear indication of such intent exists, our inquiry is at an end and the double jeopardy bar does not apply.  If there is no clear indication of legislative intent to impose cumulative punishments, we examine the relevant statutes under the same-elements test of Blockburger.  Under that test, if each statutory offense requires proof of an element not contained in the other, the offenses are not the "same" and double jeopardy is no bar to cumulative punishment.

Williams v. Singletary, 78 F.3d 1510, 1513 (11th Cir. 1996).

> 2.       Federal Review of State Court Decision

Petitioner raised this double jeopardy claim in his Rule 3.850 motion (Ex. I at 8–9, 15–16). The state circuit court adjudicated the claim as follows:

> The Defendant challenges, on double jeopardy grounds, his dual convictions for burglary of a conveyance while armed with explosive or dangerous weapon and aggravated assault with a firearm.  See Attchment 1, at 230–231; Attachment 2.  The Court finds that these dual convictions do not violate double jeopardy principles. See Swain v. State, 744 So. 2d 474 (Fla. 2d DCA 1999); Bronson v. State, 768 So. 2d 1274 (Fla. 1st DCA 2000); see also Valdes v. State, 3 So. 3d 1067 (Fla. 2009).
>
> Burglary of a conveyance while armed and aggravated assault with a firearm do not require identical elements of proof.  The offenses are not degrees of the same offense.  Finally, contrary to the Defendant's argument, aggravated assault is not a lesser included offense subsumed by burglary of a conveyance while armed. § 775.021(4) Fla. Stat.

(Ex. I at 120–21).

Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. J).

The relevant Florida statutes specifying the separate offenses of burglary of a conveyance while armed with a dangerous weapon and aggravated assault by threat with a firearm are sections 810.02(1)(b), and (2)(b) and 784.021(1)(a), respectively.  At the time of Petitioner's offense conduct, January 18, 2007, Florida Statutes § 810.02 provided, in relevant part:

(1)

. . . .

(b) For offenses committed after July 1, 2001, "burglary" means:

1. Entering a dwelling, a structure, or a conveyance with the intent to commit an offense therein, . . . .

(2) Burglary is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084, if, in the course of committing the offense, the offender:
. . . .
(b) Is or becomes armed within the dwelling, structure, or conveyance, with explosives or a dangerous weapon; . . .

Fla. Stat. § 810.02(1)(b), (2)(b).

Florida Statutes § 784.021 provided, in relevant part:

(1) an "aggravated assault" is an assault:
(a) With a deadly weapon without intent to kill; . . .

Fla. Stat. § 784.021(1)(a). "Assault" is defined as "an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent. Fla. Stat. § 784.011.

None of those statutory provisions indicate whether the Florida legislature authorized cumulative sentences where the statutes are offended in a single criminal episode. Therefore, rules of statutory construction must be applied to help determine legislative intent.

The Florida legislature set forth rules of construction in Florida Statutes section 775.021. That provision provides, in relevant part:

(1) The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.

(2) The provisions of this chapter are applicable to offenses defined by other statutes, unless the code otherwise provides.
. . . .
(4)(a) Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense; and the sentencing judge may order the sentences to be served concurrently or consecutively.

> For the purposes of this subsection, offenses are separate if each offense requires proof of an element that the other does not, without regard to the accusatory pleading or the proof adduced at trial.
>
> (b) The intent of the Legislature is to convict and sentence for each criminal offense committed in the course of one criminal episode or transaction and not to allow the principle of lenity as set forth in subsection (1) to determine legislative intent. Exceptions to this rule of construction are:
>
> 1. Offenses which require identical elements of proof.
>
> 2. Offenses which are degrees of the same offense as provided by statute.
>
> 3. Offenses which are lesser offenses the statutory elements of which are subsumed by the greater offense.

Fla. Stat. § 775.021 (2003). Based upon this language, it is clear that the Florida Legislature expressly intended to convict and sentence a defendant for each offense he commits during the course of a single criminal episode, with three exceptions to that rule. Fla. Stat. § 775.021(4)(b). The exceptions adopt the Blockburger test. *See* State v. Weller, 590 So. 2d 923, 925 (1991).

As the state postconviction court found, and Petitioner concedes, burglary of a conveyance while armed and aggravated assault with a firearm do not require identical elements of proof. *See* Bronson v. State, 768 So. 2d 1274 (Fla. 1st DCA 2000) (defendant's convictions for burglary with a deadly weapon and aggravated battery did not violate prohibition against double jeopardy, as each offense contained an element that the other did not; burglary required proof only that defendant intended to commit battery during burglary, while aggravated battery required that defendant actually committed battery). The state court additionally determined that the offenses are not degrees of the same offense, and aggravated assault with a firearm is not a lesser included offense of burglary of a conveyance while armed. This federal court is bound by those determinations, because they are the state court's interpretations of state law.[5] *See* Bradshaw v. Richey, 546 U.S.

_____

[5] As Respondent notes, had Petitioner been charged with burglary with assault or battery and aggravated assault, his convictions for both may have violated double jeopardy, because aggravated assault is a permissive lesser included offense of burglary with assault or battery. *See* The Florida Bar 2002 Florida Standard Jury Instructions in Criminal Cases, Fourth Edition, Part Two: Instruction on Crimes, Chapter 13.1 Burglary with Assault, Lesser Included Offenses (2002). However, Petitioner was not charged with or convicted of burglary with assault or battery (*see* Ex. A at 2–3, 12–14). Further, the crime with which he was charged and convicted, burglary with a firearm, is a different crime than

74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) (citation omitted); Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975) (citations omitted); see also Herring v. Sec'y Dep't of Corr., 397 F.3d 1338, 1354–55 (11th Cir. 2005). In light of the state court's interpretations of Florida law, Petitioner failed to show a double jeopardy violation.

Petitioner failed to demonstrate that the state court's adjudication of his double jeopardy claim was contrary to or an unreasonable application of clearly established federal law. Therefore, he is not entitled to federal habeas relief.

## IV. CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

---

burglary with assault or battery. See Swain v. State, 744 So. 2d 474 (Fla. 2d DCA 1999).

At Pensacola, Florida, this 20<u>th</u> day of July 2012.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**